# EXHIBIT B

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT



for the

Northern District of California

SEP 24 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

In the Matter of the Search of                )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*   )          Case No.
                                              )
150 HEGENBERGER ROAD, OAKLAND, CALIFORNIA   )
                                              )




### APPLICATION FOR A SEARCH WARRANT

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A2

located in the  Northern _____ District of California _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachments B & C

    The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
      ☑ evidence of a crime;
      ☑ contraband, fruits of crime, or other items illegally possessed;
      ☑ property designed for use, intended for use, or used in committing a crime;
      ☐ a person to be arrested or a person who is unlawfully restrained.

    The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371/1349 | Conspiracy |
| 18 U.S.C. § 1014 | False Statement to a Bank |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1546 | Visa Fraud |
| 18 U.S.C. § 1956/1957 | Money Laundering |
| 26 U.S.C. § 7201 | Tax Evasion |

    The application is based on these facts:
See attached Affidavit of Special Agent Steve Coffin Support of Application for Search Warrant

Approved
As To Form: _____
       Colin Sampson, AUSA

_____
*Applicant's signature*

Steve Coffin, Special Agent, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/24/2019 _____

_____
*Judge's signature*

City and state: San Francisco, California _____

Hon. Joseph C. Spero, United States Magistrate Judge
_____
*Printed name and title*

**AFFIDAVIT OF STEVE COFFIN, FEDERAL BUREAU OF INVESTIGATION IN SUPPORT OF SEARCH WARRANTS**

I, Steve Coffin, a Special Agent with the Federal Bureau of Investigation ("FBI") in Concord, California, being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION

1.     I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of the residence of ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, Mill Valley, California, further described in **Attachment A1**, and the office of the Oakland Executive Airport Hotel, formerly known as the Red Lion Hotel, 150 Hegenberger Road, Oakland, California, which is further described in **Attachment A2**, for the items, things, and property described in **Attachment B**. As described in **Attachment C**, the execution of the warrants will be conducted in accordance with the Northern District of California's Protocol for Searching Devices or Media that Store Data Electronically. This Affidavit incorporates by reference Attachments A, B, and C.

2.     As described in this Affidavit, ▮▮▮▮▮▮▮▮▮ ("▮▮▮▮") was the beneficiary of dozens of large transfers of funds from China, which were then consolidated in accounts in U.S. banks. The funds were used to purchase four properties in northern California between 2013 and 2015. Although ▮▮▮▮ personally contributed almost no funds in these ventures, she emerged with ownership interests ranging from 30% to 100% in the properties. She was essentially a straw buyer of the properties on behalf of others in China. Using her ownership stake in these properties as collateral, ▮▮▮▮ subsequently obtained mortgage loans from federally insured financial institutions for each of the four properties. ▮▮▮▮ used the properties she had obtained with what appear to be the funds of others in order to bolster her credibility as a guarantor of the mortgages, and thereby committed fraud to obtain the refinance loans.

3.      As described in this Affidavit, there is probable cause to believe that the home of ▮▮▮

▮▮▮▮▮▮ at ▮▮▮▮▮▮▮▮▮▮, Mill Valley, California (hereinafter "▮▮▮ Residence"), and

the office of the Oakland Airport Executive Hotel, formerly known as the Red Lion Hotel at 150

Hegenberger Road, Oakland, California (hereinafter "Red Lion Hotel") contain evidence, fruits, and

instrumentalities of violations of 18 U.S.C. §§ 371/1349 (Conspiracy), 1014 (False Statement to a

Bank), 1343 (Wire Fraud), 1344 (Bank Fraud), 1546 (Visa Fraud), 1956/1957 (Money Laundering), and

26 U.S.C. § 7201 (Tax Evasion). The facts set forth in this affidavit are known to me as a result of my

personal participation in this investigation, my training and experience, review of relevant banking,

business, and public records, and consultation with agents of the Internal Revenue Service – Criminal

Investigations and the Federal Bureau of Investigation (hereinafter "FBI"), who are also participating in

this investigation. Because this affidavit is being submitted for the limited purpose of securing search

warrants, I have not included each and every fact known to me concerning this investigation. I have set

forth only those facts that I believe are necessary to establish probable cause to believe that evidence,

fruits, and instrumentalities of the above-referenced violations will be found within the ▮▮▮ Residence

and the Red Lion Hotel.

## II.      BACKGROUND

### A.      Agent Background

4.      I have been a Special Agent of the FBI since June 1998. I have a law degree from the University

of Virginia, and I served over four years as an attorney in the U.S. Air Force. I am currently assigned to

the FBI's San Francisco Field Office, Concord Resident Agency. Since joining the FBI over 21 years

ago, I have investigated violations of federal law in white collar crimes. I have received extensive

training and instruction on federal criminal laws. I am authorized under Title 18 USC § 3052 to execute

warrants issued under the laws of the United States and to make arrests, based upon probable cause, for

any felony cognizable under the laws of the United States.

III.   **PROBABLE CAUSE**

Background of ████████████ and the Real Estate Acquired

5.   ████████████ (hereinafter "████") is a ████████ naturalized U.S. citizen. She claims to have a Bachelor's Degree from a fashion school in Beijing. ████ has owned and lived in the ████ Residence in Marin County with her husband (collectively "the ████") since 2002.

6.   According to their federal income tax returns, the ████ have reported adjusted gross income rising from $169,350 in 2012 to $321,800 in 2016. The ████ have good credit ratings, with scores in the high 700s to low 800s, as noted by banks in evaluating loan applications involving the ████.

7.   ████████ has extensive experience in the tour business. According to statements provided by ████ to financial institutions in 2015 and 2016, she has arranged for thousands of groups and delegations to visit the United States from China over the past 10 years. The Department of State Consular Consolidated Database for Non-Immigrant Visas showed ████ was listed as the U.S. point of contact for over 700 Chinese visitors between 2011 and 2017.[1]

8.   Prior to 2013, ████ and her husband gradually acquired a few properties in the San Francisco Bay Area. In addition to the ████ Residence in Mill Valley, they purchased a house on Cabrillo Street, San Francisco in 1999, and a house in Brentwood, California in a foreclosure sale in 2009.

9.   Starting in 2013, ████ began a two-year spree of acquiring real estate. Each of the properties were much more expensive than the ████' earlier acquisitions, and the new real estate was primarily commercial in nature. ████ either took title to the properties with her husband, or title was

---

[1] There is no current evidence ████'s husband is involved in the tour business, nor does he seem to have an active role in his wife's commercial real estate companies. According to loan documents, ████'s husband was employed as a designer at Lucasfilm Entertainment and Telltale Games.

1  vested in closely held companies in which ▓▓▓▓ owned a substantial interest.  The acquisitions were

2  as follows:

3      a.  In January 2013, ▓▓▓▓, doing business as Morning Sun Capital LLC, purchased a

4      single room occupancy motel in a distressed neighborhood on 6th Street in San

5      Francisco.  The motel, known as the Shree Ganeshai Hotel, has 32 rooms and two

6      ground level retail units.  California Secretary of State filings for Morning Sun

7      Capital showed that the company was formed in 2012, with ▓▓▓▓ as the sole

8      member of the LLC, but other records (e.g. the ▓▓▓▓' tax returns and loan

9      applications) showed ▓▓▓▓ shared ownership of Morning Sun Capital with her

10      husband.  These records also showed ▓▓▓▓'s sibling Xuehua ("Ed") PENG had a

11      3% share of the ownership in Morning Star Capital.

12      b.  In August 2013, ▓▓▓▓, doing business as 150 Hegenberger Capital LLC, purchased

13      the Red Lion Hotel in Oakland.  The Red Lion Hotel is a large 189 room hotel near

14      the Oakland International Airport.  California Secretary of State filings for 150

15      Hegenberger Capital showed that the company was formed in 2013, with ▓▓▓▓

16      signing the incorporation documents.  Documents in the escrow file showed ▓▓▓▓

17      as the 30% owner of the company, with the remaining shares owned by Chinese

18      national ▓▓▓▓.

19      c.  In January 2015, ▓▓▓▓, doing business as CP Capital Group, Inc., purchased an 80

20      room motel in Dixon, California.  At the time of the purchase, the property was a

21      Comfort Inn & Suites, but CP Capital re-branded the property as a Country Inn &

22      Suites (hereinafter "Country Inn Hotel").  California Secretary of State filings for CP

23      Capital showed that the company was formed in 2015, with ▓▓▓▓ signing as a

24      director.  Later filings and loan applications showed ▓▓▓▓ to be the Chief

25      Executive Officer (CEO) of the company with an 80% share of the ownership.

d.  In November 2015, ▓▓▓▓ personally purchased a vineyard and a house with a bed

& breakfast license in Napa, California.  Late in the sales process, ▓▓▓▓ added her

husband's name to the sales contract as a co-buyer of the property.

Overview of Complex Financing of the Real Estate Purchases

10.     The majority of the funds used to acquire these four commercial properties between 2013

and 2015 originated in China.  The funds were wired from China, apparently by nominees, and amassed

in U.S. bank accounts (hereinafter "Consolidation Accounts").  Most of these accounts were owned by

Chinese nationals, but ▓▓▓▓ also owned Consolidation Accounts.  Money from these Consolidation

Accounts funded the acquisition of the properties by ▓▓▓▓ and her related real estate companies

between 2013 and 2015.

11.     The wires from China into the Consolidation Accounts were typically in amounts just

under $50,000.  The senders of the wires from China rarely sent more than one wire.  I am aware,

through experience and training, that China has currency controls making it difficult or illegal for

Chinese citizens to wire more than $50,000 out of China in one year.  Wealthy Chinese, therefore, have

been known to distribute their funds to nominees, who then wire their funds out of China, including to

the United States, to avoid the currency controls.  In light of this practice, I believe most or all of the

senders of the wires from China in this case were nominees transferring the funds on behalf others in

China who actually owned of the funds.  As I will demonstrate in an example below, I believe that some

of the Consolidation Accounts in the United States were also held by nominees.

12.     Although few of the U.S. bank accounts receiving funds from China were overtly owned

by ▓▓▓▓, she benefited from several of the Consolidation Accounts supposedly owned by others.

Aside from using some of the Consolidation Accounts' funds for personal family expenses, ▓▓▓▓ also

put herself on title to properties purchased by the funds from China.

13.     The extent of ▓▓▓▓'s de facto control of the Consolidation Accounts appeared to vary.

She apparently repaid, with her own money, some of the funds used for her benefit.  For other

1    Consolidation Accounts, there is no evidence she reimbursed funds transferred to her to purchase real

2    estate or pay personal expenses.

3        14.    In my training and experience, the fact that ▆▆▆▆ repeatedly used funds sourced from

4    others that did not belong to her to buy properties through Morning Sun Capital, 150 Hegenberger

5    Capital, and CP Capital indicates she was serving as a straw buyer on behalf of the true owner(s) of the

6    funds.  ▆▆▆▆ was well-situated to be a straw buyer.  ▆▆▆▆ was an American citizen with a good

7    credit rating residing near the properties bought with the funds – traits which could make her an

8    attractive titular owner in the eyes of potential lenders.  The fact that ▆▆▆▆ reaped a financial reward,

9    by using funds in Consolidation Accounts for her own benefit, was not inconsistent with her serving as a

10   straw buyer according to my training and experience.

11       15.    To illustrate the sophisticated nature of the system used to move the funds, I will discuss

12   examples in which the Consolidation Accounts were used, with ▆▆▆▆ having different levels of

13   control over the accounts.  For these examples, I will focus on the Consolidation Accounts owned by

14   ▆▆▆▆▆ and ▆▆▆▆▆.

15       Examples of the Role of Consolidated Accounts

16       16.    ▆▆▆▆▆, according to Department of State records, is a ▆▆▆▆ woman and a

17   Chinese citizen.  In 2012, while visiting the United States on a visa, she opened accounts at East West

18   Bank and Wells Fargo Bank, and she was the sole signatory on these accounts.  Over the next three

19   years, ▆▆ flew back and forth between the United States and China several times.  During periods in

20   which travel records indicate that she was out of the United States, her accounts remained active with

21   someone drawing money from her account in the United States.  For instance, on July 22, 2014 – when

22   immigration records showed her to be outside of the United States – her East West Bank account was

23   debited in the amount of $1,432.59 to pay the Nordstrom luxury department store[2].

24   ───────────────
       [2] According to publicly available information on the Internet, Nordstrom only had stores in the
25   United States during this time.  Nordstrom opened its first store in Canada in September 2014.

17.      █'s Consolidated Accounts received over $1 million in 23 wires from 22 different individuals in China. Around half of the wires were close to $50,000, indicating they were being structured to avoid Chinese currency controls.

18.      The funds in █'s Consolidated Accounts benefited █. █'s funds helped purchase several properties, including the Shree Ganeshai Hotel, the Red Lion Hotel, and the Country Inn Hotel. Only with the Country Inn did █ receive a stake in any ownership – a 10% share. (█'s funds used in the Country Inn purchase were roughly three times as large as █'s personal contribution. █, however, received an 80% share of the ownership.)

19.      █'s funds also paid for expenses apparently unrelated to real estate, but which still benefited █. For instance, on August 22, 2013, a check for $20,947.25 was drawn on █'s East West Bank to pay Met Life. The memo line on the check indicated it was payment for the "█ Life Policy." Likewise, between May 2014 and February 2015, a private school in Marin County made monthly tuition draws of $3,552.70 from █'s East West Bank account. At the time, according to social media websites, █'s daughter was enrolled at the school. Following the closure of █'s bank accounts in 2015, █ began making payments to the private school from the █' own bank account.

20.      According to State Department records, █ listed her employer as a fire detector manufacturing company in China. She is the mother of █, a college student in Oklahoma who is the owner of other Consolidation Accounts. █'s only observable benefit from any of these transactions was to receive the 10% ownership in CP Capital, which owns the Country Inn Hotel.

21.      The other example involves █. █, according to Department of State records, is a █ male Chinese citizen. Like █, █ opened numerous bank accounts while visiting the United States, and his accounts remained active during periods in which he was outside of the country. Also like █, █ received funds wired from China, typically just below $50,000. █, however, received more funds than █, and he also received funds from Consolidation Accounts in the names of others.

AFFIDAVIT OF FBI SA STEVE COFFIN                    7

1    Funds in these Consolidation Accounts were essentially consolidated again, and amassed in bank

2    accounts in the name of ▮.

3          22.      ▮'s employment background is unclear.  Department of State records show ▮ applied

4    for a visa in 2009 as a "claims manager" at the Yongxing Industrial Company in China.  His visa was

5    denied in 2009 and again in 2010.  Starting in 2011, ▮ succeeded in obtaining visas.  In 2012, he began

6    describing himself as the CEO of a hotel in China.  In 2015, he listed his American point of contact as

7    "▮▮▮▮▮" whom he identified as a friend.  In loan refinance documentation from 2015 related to

8    the Red Lion Hotel, ▮ was listed as, "a real estate investor," and "founder and director" of several silk

9    industry businesses and a hotel.

10          23.      In escrow, ▮ contributed the majority of funds to purchase three properties between 2013

11   and 2015 – the Red Lion Hotel, the Country Inn Hotel, and the Napa vineyard.  ▮ also made a loan to

12   CP Capital to help the Country Inn Hotel holding company pay down its mortgage after escrow closed.

13          24.      Like ▮, who received very little for use of the funds in her Consolidated Accounts, ▮

14   received no official stake in the ownership of the Country Inn Hotel or the Napa vineyard.  ▮ essentially

15   yielded his ownership interest in the Dixon and Napa properties to ▮.  On the other hand, ▮ did

16   get a 70% ownership interest in the Red Lion Hotel's holding company 150 Hegenberger Capital.  (At

17   the time 150 Hegenberger Capital sought to refinance its loan in 2015, ▮ lowered his ownership

18   percentage so he had an equal 30% share with ▮.)

19          25.      Aside from purchasing properties and putting ▮ on the title, ▮ also provided

20   operating capital to the ventures.  For instance, he deposited hundreds of thousands of dollars into the

21   bank account of CP Capital Group in 2015.  On the other hand, not all of this assistance was without

22   strings.  In April 2016, ▮ drafted checks making payments of $120,000 to ▮, and indicated it was

23   to repay ▮ for a loan.

24          26.      ▮'s family also was involved in repaying ▮ for previous loans.  On the same day

25   as one of ▮'s payments to ▮, U.S. Tour and Travel issued a check payable to ▮ for $180,000.

1   According to a California Secretary of State filing from 2013, ███'s brother Xuehua PENG was the

2   CEO and sole director of U.S. Tour and Travel.  A few days after this check was drafted, PENG's

3   daughter ███ obtained a cashier's check paying ██ another $200,000.  The Pengs' checks to ██

4   displayed memo lines indicated they were repaying earlier loans made by ██.

5          <u>Purchase of the Shree Ganeshai Hotel (2013)</u>

6        27.    As noted above, the limited liability company Morning Sun Capital purchased the Shree

7   Ganeshai Hotel in San Francisco in January 2013.  ███ was the CEO of the company, according to

8   Secretary of State filings.  ███ owned 97% of Morning Sun Capital, with ███'s brother Xuehua

9   PENG owning the remaining interest.  The sales price of the Shree Ganeshai Hotel was $1,699,000.

10  Morning Sun Capital financed the acquisition with a $680,000 mortgage loan from East West Bank.

11       28.    Funds from China purchased the property for ███.  The initial deposit of $100,000

12  into the escrow account came from a Consolidation Account owned by a 20-year-old Chinese student

13  attending an art academy in the Bay Area.  The remaining funds used to purchase the property,

14  $933,333, were wired into escrow from the bank account of Morning Sun Capital.  I examined the

15  deposits that were made into the Morning Sun Capital bank account before the funds were wired out and

16  discovered that the funds originated in China.  Some monies were wired directly from China into the

17  Morning Sun Capital account, but most of the funds came from other Consolidation Accounts.  For

18  instance, over $311,000 was transferred from the Consolidation Account owned by a different 20-year-

19  old Chinese student.  The Consolidation Account of ███, discussed above, contributed another

20  $250,000 to the Morning Sun Capital bank account.  After more than $975,000 was deposited into the

21  company's bank account from China, ███ wired the funds into the escrow account to buy the Shree

22  Ganeshai Hotel.  I could not trace any of the funds used to purchase the property back to ███.

23  //

24  //

25  //

AFFIDAVIT OF FBI SA STEVE COFFIN      9

Purchase of the Red Lion Hotel (2013)

29.     As noted above, the closely held company 150 Hegenberger Capital LLC purchased the Red Lion Hotel in Oakland in August 2013. Corporate documents showed ▓▓▓ and ▓ were co-managers of the holding company. The purchase price of the Red Lion was $10,350,000.

30.     The buyers made a down payment of $5,000,000. According to bank records, ▓ deposited 90% of these funds into escrow, using funds amassed in Consolidated Accounts in his name. The remaining $500,000 of the down payment came from 150 Hegenberger Capital's account in East West Bank. This account had been pre-loaded with funds taken from other Consolidated Accounts, including an account in the name of ▓▓▓▓. None of the funds used for the purchase of the Red Lion Hotel came from ▓▓▓, who received a 30% stake in the holding company.[3]

Purchase of the Country Inn Hotel (2015)

31.     As noted above, the closely-held company CP Capital Group, Inc. purchased the Country Inn Hotel in Dixon, California in January 2015. Corporate documents showed ▓▓▓ owning 80% of the stock in the company and serving as the CEO. The purchase price of the Country Inn Hotel was $5,280,000.

32.     The buyers made a down payment of approximately $1,059,000. Although ▓▓▓▓ received no ownership stake, he deposited a check in the amount of $800,000 into escrow. $150,000 was drawn from Consolidated Accounts of ▓▓▓, and another $50,000 came from a Consolidated Account in the name of her son ▓▓▓. There was a shortfall in the amount the buyers needed in escrow, and ▓▓▓ wired $59,493.42 from her personal Bank of America account on January 28, 2015. Consequently, ▓▓▓'s capital contribution was approximately 11% of the purchase price, and she received an 80% ownership stake in the holding company.

---

[3] In a declaration filed in 2019 in a civil action before the Alameda County Superior Court, described further below, ▓▓▓ stated she contributed "$1,500,000 to the capital of the Company (150 Hegenberger Capital LLC)." This statement is at odds with the bank records I have reviewed, which show ▓▓▓ making no financial contribution to the purchase of the Red Lion Hotel.

1    Purchase of the Napa Vineyard (2015)

2    33.    As noted above, the ▓▓▓ obtained a property in Napa containing a vineyard and a

3    house licensed to serve as a bed & breakfast hotel.[4]  They took title to the property in their own names in

4    November 2015.  The purchase price of the real estate was $2,280,000.

5    34.    The down payment on the property was in the amount of $1,794,173.  Of that amount,

6    just under 12% was deposited into escrow from accounts owned by the ▓▓▓.  The remaining

7    $1,586,000 was wired into escrow by ▓▓▓▓.  I have not discovered evidence that ▓ received an

8    ownership stake or a note in exchange for his capital contribution.

9    Evidence that ▓▓▓ Was a Straw Buyer

10   35.    Based on the nature of the above transactions and other evidence I have reviewed in this

11   case, there is probable cause to believe that ▓▓▓ is a straw holder of funds and a straw purchaser of

12   these properties.  There are several pieces of evidence that support this conclusion.  First, there is no

13   evidence that these transactions involved bona fide payments to ▓▓▓ that she earned in return for her

14   services or other work.  Though ▓▓▓ conceivably could earn some ownership share in the properties

15   by orchestrating the purchase and loan transactions or managing the properties herself, her ownership

16   stake in each vastly exceeds what, in my training and experience, would be a reasonable amount for an

17   individual being granted an ownership stake in real estate as compensation for management services.

18   Second, ▓▓▓ did not report these payments or the ownership stakes that she received in these

19   properties as earnings on her tax returns or elsewhere.  The ownership stakes she received in the four

20   properties vastly exceeded the income reported on her and her husband's tax returns in this time period.

21   Third, ▓▓▓ runs a tour business, and the earnings from that tour business are not large, and are

22   accounted for in other payments made the bank accounts of the business.  In my experience, it is

23   unlikely the fund transfers from China are to compensate her for her work in this business. Fourth, I

24   ───────────────────────
[4] The hotel was formerly known as the Brookside Vineyard Bed & Breakfast.  Although ▓▓▓
25   renovated the property, it is not currently an operational hotel.

AFFIDAVIT OF FBI SA STEVE COFFIN                    11

know from my experience and from other agents that many wealthy individuals in China are known to use straw buyers to move and/or hide assets in the United States. These transactions often involve the kinds of complex nominee schemes observed in this case. Fifth, the source of the funds includes many different individuals, who, for the reasons explained below, appear to be nominees themselves, consolidating funds in individual accounts, and are each unlikely to have genuinely been paying ████ for anything.

36.    It is conceivable, as discussed elsewhere in this affidavit, that some of the funds she received from China were actually loans from individuals in China. Based on my review of the financial records, which show limited repayments, this appears to be a small share of the funds. But in any event, for reasons discussed below, even if some of the funds were bona fide loans as opposed to funds provided to ████ so she could act as a straw purchaser, ████ nonetheless lied to the financial institutions in receiving the loans discussed below, as she did not disclose these loans other than the "family" loans discovered by the underwriter in connection with the Shree Ganeshai Hotel refinance.

Overview of the Fraud in the Securing of Refinance Loans by ████

37.    None of the four properties acquired in 2013 and 2015 were purchased outright. East West Bank granted a mortgage loan on the Shree Ganeshai Hotel, while the former owners of the other properties provided financing in the form of "seller-carryback" loans. Between 2015 and 2018, all of these loans would be paid off and new "refinance" loans would be obtained. The providers of these refinance loans were federally insured financial institutions.

38.    According to the loan application documents, ████ was the representative of the owners for each of the four refinance loans. She signed the loan applications and provided the documentation required by the lenders' underwriters. In some cases, ████ personally benefited from the refinance loans and deposited proceeds in her own bank accounts.

39.    There is probable cause to believe that, in at least three of the four loan applications, ████ made false statements. The three involved each of the three hotels, in which the borrowers were

1  the closely held companies rather than an individual owner. For these three loan applications, ███████

2  held herself out as a personal guarantor of each of the loans – essentially promising to continue paying

3  the mortgages if the closely held companies failed to do so. In each of these instances, ██████ provided

4  information to the lenders that grossly inflated her net worth, thereby making it seem like her personal

5  guarantee was a valuable safeguard for the lenders. In each case, ██████ was a straw owner of the

6  companies, and her personal guarantee was actually worth little.[5]

7      Personal Guarantee of the Red Lion Hotel Refinance (2015)

8      40.    When 150 Hegenberger Capital purchased the Red Lion Hotel in 2013, the original

9  owner provided a seller-carryback loan for $5,500,000. According to terms of the note for this loan, the

10  debt had to be paid in full by August 2015. As a consequence, the owners of 150 Hegenberger Capital

11  needed to refinance the loan before the debt came due.

12      41.    On July 30, 2015, 150 Hegenberger Capital refinanced its mortgage with a loan from East

13  West Bank. East West Bank is a federally insured financial institution regulated by the Federal Deposit

14  Insurance Corporation. At the time of the refinance, corporate documents given to the escrow company

15  showed ██████ continued to be a 30% owner of the holding company, but ████████ divided his

16  majority position between himself, his son ████████, and his brother ██████. All of the █ family

17  were Chinese nationals.

18      42.    The owners of 150 Hegenberger Capital sought a loan of $5,800,000. In evaluating their

19  loan application, the underwriters for the bank noted all of the owners were willing to personally

20  guarantee payment of the loan. The underwriters put special significance in ██████'s guarantee, as she

21

22

23      [5] ██████ also refinanced the Napa property. She obtained a loan from Stearns Lending in
    November 2018 and pulled $679,000 out of the property's equity. (The funds were deposited into
    ██████'s personal bank account.) This refinance loan did not involve a personal guarantee by ██████.
24  Instead the loan was secured entirely by the remaining equity in the Napa property. Since ██████ was
    the straw buyer of the Napa property – only contributing ~12% of the purchase funds, despite being the
25  paper owner of the property – there is some evidence that this loan was obtained in a fraudulent manner.

1   was the only co-owner residing in the United States. The underwriters noted ▢ claimed a net

2   worth of $6.7 million, excluding her alleged $2.1 million interest in the Red Lion Hotel.

3   43.   ▢ provided the bank with detailed information about her claimed assets, including

4   the Shree Ganeshai Hotel and the Country Inn Hotel. She claimed to own 100% of Morning Sun Capital

5   – the owner of the Shree Ganeshai Hotel – and 80% of CP Capital – the owner of the Country Inn Hotel.

6   The net value of her share in these two properties was valued at $1,044,843 and $2,304,000,

7   respectively. Therefore, approximately half of ▢'s net worth was based in properties which she

8   claimed to own, but in which she had invested almost nothing. There was no indication East West Bank

9   was aware their most important guarantor was a straw buyer of the properties used to establish she was a

10  viable personal guarantor on the loan.

11  44.   ▢ signed a Commercial Guaranty on June 18, 2015. The Commercial Guaranty

12  contractually bound her personal guarantee to East West Bank. The document noted, "all such financial

13  information which currently has been . . . provided to Lender is and will be true and correct in all

14  material respects and fairly present Guarantor's financial condition as of the dates the financial

15  information is provided."

16  45.   With ▢'s Commercial Guaranty and financial statements in hand, the underwriters

17  approved the loan. East West Bank wired the proceeds of the refinance loan – $5,468,626.50 – to the

18  escrow company on July 30, 2015.

19  Personal Guarantee of the Country Inn Hotel Refinance (2016)

20  46.   When CP Capital Group purchased the Country Inn Hotel in 2015, the original owner

21  provided a seller-carryback loan of $4,280,000. According to terms of the note for this loan, the debt

22  had to be paid in full by July 2017. As a consequence, the owners of CP Capital Group needed to

23  refinance the loan before the debt came due.

24  47.   On or about April 4, 2016, the owners of CP Capital Group chose to refinance their

25  mortgage with a loan from Meriwest Credit Union. Meriwest Credit Union is a federally insured

1  financial institution regulated by the National Credit Union Administration.  At the time, documents

2  provided to the lender showed ████ as the 78.5% owner of CP Capital Group.  The other listed

3  owners were all Chinese nationals, including ██████.

4      48.    As with the refinance loan for the Red Lion Hotel, ████'s personal guarantee seemed

5  to be an important reason for Meriwest Credit Union's decision to approve the loan.  The underwriters

6  specifically referred to a personal financial statement provided by ████ that stated she had a net

7  worth of $12.5 to $14.5 million. (Note the almost doubling of her stated net assets from the Red Lion

8  refinance application around a year earlier.)

9      49.    In addition to claiming financial strength from her ownership interest in the Red Lion

10  Hotel and the Country Inn Hotel, ████ also noted her ownership of the property in Napa in the loan

11  application to Meriwest Credit Union.  (The Napa property had not been acquired yet at the time of the

12  refinance of the Red Lion Hotel in 2015.)  In a "Schedule of Real Estate Owned" - signed by ████ -

13  she stated the Napa property had no mortgage and was producing $6,500 in monthly rent.  There is

14  probable cause to believe that neither of these statements was true, as the property was encumbered by a

15  $500,000 seller carryback loan and was producing no income, according to ████'s own tax and

16  banking records.

17      50.    The credit union's underwriters focused on ████'s role as a guarantor and her

18  extensive real estate holdings.  While acknowledging ████ had only 30% of the Red Lion Hotel, they

19  noted ████ had provided an operating agreement for the Red Lion Hotel showing executive

20  management was vested in her.

21      51.    Meriwest Credit Union's loan committee approved the loan on July 25, 2016.  The credit

22  union wired the proceeds of the refinance loan – $2,700,000 – to the escrow company on August 9,

23  2016.

24      52.    Meriwest Credit Union required CP Capital to provide updated financial information on

25  an annual basis.  Much of the credit union's 2017 review focused on ████'s financial condition and

1  her worth as a guarantor.  The underwriter was overall impressed with the financial picture.  He noted

2  [redacted] had improved her cash position and reduced her liabilities.  He based this finding on the updated

3  financials provided by [redacted].

4       53.     [redacted]'s updated personal financial statement contained a falsehood improving her

5  credibility as a guarantor.   The most noticeable change to her statement was the assertion that [redacted]

6  had sold the Shree Ganeshai Hotel, thereby unlocking the capital in this asset and improving her cash

7  position.  In reality, there is no indication [redacted] – or Morning Sun Capital – sold the property.  No

8  change of ownership was recorded with the San Francisco Assessor-Recorder.  Likewise, there was no

9  indication in [redacted]'s federal tax return or Morning Sun Capital's Schedule K-1 that she sold her

10  interest in the holding company.[6]

11      54.     In her 2017 Personal Financial Statement, [redacted] continued to claim property for which

12  she was essentially a straw buyer.  She asserted the value of her share of the Red Lion Hotel, the

13  Country Inn Hotel, and the Napa property amounted to almost $10 million.  With this information in

14  hand, Meriwest Credit Union's annual credit review found the financial condition of the loan remained

15  sound.

16      Personal Guarantee of the Shree Ganeshai Hotel Refinance (2017)

17      55.     When Morning Sun Capital purchased the Shree Ganeshai Hotel in 2013, East West Bank

18  provided a mortgage loan of $680,000.  In 2017, Morning Sun Capital refinanced the loan with East

19  West Bank.  The amount of the new loan was $1,150,000.

20

21

22

---

23  [6] While [redacted]'s Personal Financial Statement contained a material falsehood having the effect
24  of inflating her liquidity, her liquidity was actually improved by cash infusion.  While she received no
   cash from the sale of the Shree Ganeshai Hotel, one of the bank accounts under her control received
   over $900,000 in wires from China during 2017.  This account was in the name of CP Capital Group,
25  but the incoming wires had no apparent connection to the operation of the Country Inn Hotel.

56.  ████ again signed a Commercial Guaranty promising to be personally liable for the loan if Morning Sun Capital defaulted.  She also provided an updated personal financial statement, dated January 10, 2017, with the loan application.

57.  ████'s financial statement inflated her net worth, thereby over-valuing her role as a guarantor.  She claimed the Napa property was owned "free and clear" despite the existence of the seller-carryback loan.  She also claimed to have partnership interests in 150 Hegenberger Capital (33%), CP Capital Group (79%), and Morning Sun Capital (97%), which did not reflect her true status as a straw buyer.  ████ stated her interests in these properties increased her net worth by over $6 million.

58.  During the underwriting process, East West Bank discovered evidence that ████ had undisclosed liabilities with Morning Sun Capital connected to the purchase of the Shree Ganeshai Hotel.[7]  The underwriter apparently discovered ████ had purchased the property with money that was not her own.  After discussing the matter with ████, the underwriter reported that the funds used to purchase the property came from "family members who reside overseas."  The underwriter wrote, "Borrower confirmed that there are no formal notes" memorializing the debt.  Furthermore, ████ said she had paid no interest on the family debt, and the family loans had not been amortized for tax purposes.  She identified the family members as " ████ " and " ████ " – possibly referring to ████ and ████, who were owners of Consolidation Accounts who provided funding to Morning Sun Capital in 2012 and 2013.

59.  To protect East West Bank's position, ████ agreed not to pay interest or principal on the "family" loan until the bank's loan had been repaid in full.  At the insistence of the bank, ████ signed a Business Loan Agreement which, in relevant part, stated, "Borrower represents to Lender there

---

[7] It is not entirely clear from the loan file how the underwriter discovered ████ received funds from others in China for the down payment.  The underwriter wrote, "Company balance sheet on 2015 tax return shows (negative net worth) due to $1,039M personal loans from family members who reside overseas for the purchase of the subject property."  The underwriter may have been referring to the 2015 Schedule K-1 for Morning Sun Capital, which alluded to total liabilities of $1,805,216.

1    are no written notes for the $500,000 and $538,000 loans payable to other creditors and that these Other

2    Debts do not bear any interest or require periodic principal payments." ▆▆▆ further promised not to

3    make any payments on these debts until the East West Bank loan had been paid in full.

4         60.    While ▆▆▆ was forced to admit she borrowed the funds used for the down payment

5    on the Shree Ganeshai Hotel, she still lied to the underwriter. ▆▆▆ told the underwriter the funds

6    came from family members.  In my training and experience, I am aware underwriters evaluate borrowers

7    using family funding to have a higher level of reliability than straw borrowers, who have no or little

8    personal or family stake in a venture.  Borrowers often protect assets purchased with family funds as

9    dutifully as assets purchased with their own funds.  Straw borrowers, who have used funds provided by

10   unrelated third parties, are a greater credit risk to banks.

11        61.    In this case, it is unlikely the funds were provided by family members of ▆▆▆.  Prior

12   to the purchase of the Shree Ganeshai Hotel, the Morning Sun Capital bank account received two wires

13   directly from China, each worth $50,000.  The wires were from individuals named ▆▆▆ and ▆

14   ▆.  Checks were also deposited into the account from ▆▆, ▆▆▆, ▆▆▆, and ▆▆

15   ▆.  These four, in turn, owned Consolidation Accounts that received numerous wires from China

16   from different individuals.  For instance, ▆▆▆'s Consolidation Account was funded with five

17   wires from China, sent by five apparently unrelated individuals, each worth $50,000 or slightly less.

18   Two of the four benefactors of Morning Sun Capital – ▆▆ and ▆▆ – were ▆▆▆

19   students at the time of the transactions, making it unlikely that they owned the hundreds of thousands of

20   dollars they deposited into ▆▆'s account.  Furthermore, according to Department of State visa

21   records, none of the owners of the Consolidated Accounts, supposedly family members of ▆▆▆,

22   listed ▆▆ or her brother PENG or any other known members of their family as their American point

23   of contact on their visa applications, even though they were all visiting the Bay Area.  In sum, there is

24   probable cause to believe that the funds did not come entirely (or at all) from family members of

25

AFFIDAVIT OF FBI SA STEVE COFFIN                    18

1   ████. Instead, it seems more likely that ████ was a nominee involved in a complex financial

2   transaction in which she was a straw buyer acting on behalf of one or more other people in China.

3       62.   Based on the evidence obtained in the investigation, I believe probable cause exists to

4   find that ████ was a straw buyer of properties purchased with funds from China in 2013-2015; and,

5   that ████ used her nominee ownership to fraudulently obtain refinance loans for the hotel properties.

6   <u>Other Allegations of Violations of Federal Criminal Law Raised in the Civil Action</u>

7       63.   A recent legal development involving the Red Lion Hotel,[8] indicates ████'s

8   relationship with her financiers may be strained.  On July 12, 2019, ████ filed a civil complaint with

9   the Alameda County Superior Court.  With the complaint, she also submitted a signed declaration.

10      64.   ████ claimed in her declaration that the ██ family was committing immigration fraud.

11  She said the ██ family told her they invested in the Red Lion with the express purpose of gaining EB-5

12  (investor) visas for ████ and ████, who were each given a 20% stake in the holding company

13  by ████.  ████ claimed ████ and ████ were supposed to be working at the hotel to

14  be eligible for the EB-5 visas, but they did little more than occasionally show up and convert the hotel's

15  resources for personal use.  ████ alleged they generated inaccurate payroll and tax records to obtain

16  the visas.  ████ claimed to have complained about this and other matters to ████, which

17  caused the break in their relationship.

18      65.   In ████'s declaration, she also stated she had contributed $1.5 million to the purchase

19  of the Red Lion Hotel.  This claim is not consistent with the bank records I have reviewed, which

20  showed ██ had provided $4.5 million of the $5 million down payment.  (The remaining $500,000, as

21  noted above, was deposited into 150 Hegenberger Capital's bank account from three Consolidated

22  Accounts, none of which were owned by ████.)

23

---

24     [8] The Red Lion Hotel appears to have changed its name to the Oakland Airport Executive Hotel.
This indicates the hotel may no longer be a Red Lion franchisee, but there is no indication from a search
25  of property records that 150 Hegenberger Capital has sold the property.

AFFIDAVIT OF FBI SA STEVE COFFIN                    19

<u>Use of the Sites to be Searched and Probable Cause that Evidence Will Be Found There</u>

66.     I am seeking to search the business office of the Red Lion Hotel, at 150 Hegenberger Road in Oakland.  The Red Lion Hotel was by far the most expensive of the properties acquired in the complex financing scheme involving ▇▇▇.  According to escrow and loan documents from 2015-16, ▇▇▇ was the main "point of contact," "President," and "Managing Member" for the Red Lion Hotel's holding company, and her place of business was listed as the office in the hotel.  In addition, ▇▇▇ used the office in the Red Lion Hotel as the business hub for other companies in her name.  For instance, ▇▇▇ was the CEO of the International Cultural Exchange Corporation – apparently related to her tour business – and filings with the California Secretary of State show its place of business as Room 110 in the Red Lion Hotel.

67.     In order to further understand which locations inside the Red Lion Hotel would likely contain the records sought by this search warrant application, an undercover special agent with the FBI assisted me.  The undercover employee (UCE) engaged in a ruse by approaching the hotel staff on July 30, 2019, and inquiring into the possibility of leasing a number of hotel rooms.  While engaging with the staff, the UCE noted the hotel's business offices were located off a corridor on the ground floor of the building.  One of the rooms was labeled "Executive Office" and another was designated as "Sales and Catering."  Aside from these offices, conference rooms and restrooms were also accessible from the same corridor.

68.     According to ▇▇▇'s pleadings in her recently filed civil action, the ▇ family changed the locks on the office, altered passwords on electronic accounts, and fired the managers who worked with ▇▇▇ at the Red Lion Hotel.  Prior to July 9, 2019, ▇▇▇ claimed to have "deeply engaged in the day-to-day management" of the Red Lion Hotel.  She noted she had a specific focus on "marketing, customer relations, and development."  She claimed to have executive authority over the manager and assistant manager of the Hotel.  According to ▇▇▇'s declaration, the ▇ family improperly terminated

1   her executive role over the Red Lion Hotel on July 9, 2019.  The new managers promptly changed the

2   office locks, and took control of "all Hotel operations, systems, programs, and accounts."

3         69.    While ▒▒▒▒ may no longer have access to the Red Lion Hotel, the records sought

4   should still exist. ▒▒▒▒▒▒▒, the lead defendant in the civil action, filed a declaration with the Alameda

5   County Superior Court dated July 19, 2019.  In it, he wrote, "[t]he ▒ Family has been advised that it is

6   under a duty to preserve and not modify all records and documents of the Company, electronic or

7   otherwise, and will comply with this instruction during the pendency of this action."

8         70.    Based on these recent developments, it may be marginally less certain that the executive

9   office and Room 110 of the Red Lion Hotel will contain ▒▒▒▒'s personal property, records, and other

10  items, as it was before ▒▒▒▒ was barred from the premises.  On the other hand, ▒▒▒▒▒▒ has stated

11  the records of the business will be preserved.  In addition, in my experience, other relevant records not

12  specific to ▒▒▒▒ are likely to be found in the business office of the Hotel.  These would include

13  communications between participants in the complex financing of the scheme, including the ▒▒;

14  documents pertaining to the true ownership of Red Lion Hotel or any of the bank accounts or other real

15  properties in which the ▒▒ have an interest; records related to any actual work by ▒▒▒▒▒, ▒▒▒▒▒▒

16  ▒, and ▒▒▒▒▒ at the Red Lion Hotel; records relating to any EB-5 visa or visa frauds being perpetrated

17  by the ▒▒, ▒▒▒▒▒, or anyone else in connection with the property; and tax records regarding the

18  property, ▒▒▒▒▒, or the ▒▒.

19        71.    The other site to be searched is ▒▒▒▒'s residence.  ▒▒▒▒ has resided at ▒▒▒▒▒▒

20  ▒▒▒▒▒▒ in Mill Valley since 2002.  In my training and experience, people generally retain

21  documentation involving personal real estate transactions – such as the acquisition of the Napa property

22  by ▒▒▒▒ – in their home.  At home, they also retain many other forms of records, including but not

23  limited to electronic or physical address books showing familial relations, financial instruments such as

24  account statements, ledgers tracking ownership of personal or other assets, check books or other

25  transaction logs showing de facto control over bank accounts and payments to or from others, records or

1   correspondence that may show ownership or management of properties, records regarding loans or the

2   sale of properties, and records used to create tax returns.  These records include both digital and paper

3   records. The digital records kept on home computers or other devices, in my experience, typically

4   include correspondence regarding personal finances, in addition to digital forms of any number of

5   financial records.  Any such records would be evidence of the true ownership or control of the funds and

6   properties discussed above.

7        72.     Therefore, based on the information above, there is probable cause to believe that

8   evidence, fruits, and instrumentalities of the above-referenced violations, as described in Attachment B,

9   will be found within the █████ Residence and the Red Lion Hotel.

10  **IV.    SEARCH AND SEIZURE OF ELECTRONIC EVIDENCE**

11       73.     As described above and in Attachments A1-A2, and B, this Application seeks permission

12  to search for records that might be found on or in electronic storage media, in whatever form they are

13  found.  Thus, the warrants applied for would authorize the seizure of electronic storage media or

14  potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

15       **A.     Electronic Search and Seizure Protocol**

16       74.     In executing the search warrant, law enforcement agents will comply with the Northern

17  District of California's Protocol for Searching Devices or Media that Store Data Electronically, as set

18  forth in Attachment C.

19       **B.     Background on Basis and Nature of Searching Electronic Evidence**

20       75.     Based on the knowledge, training, and experience of other agents about computer

21  forensics and electronic evidence, I know of the following background providing the basis and

22  describing the nature of searching electronic evidence.

23       76.     Probable cause.  There is probable cause to believe those records will be stored on that

24  computer or storage medium, for at least the following reasons:

25

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media -- in particular, internal hard drives -- contain electronic evidence of how that computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

77.     Forensic evidence.  As further described in Attachment B, this Application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium on or in the Subject Devices because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  For example, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  As an additional example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to create, modify, delete, transmit, download, or store records or information relating to a fraudulent scheme, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

1    78.    <u>Nature of examination</u>.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the

2  warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that

3  reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a

4  later review of the media or information consistent with the warrant.  The later review may require

5  techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

6  many parts of a hard drive to human inspection in order to determine whether it is evidence described by

7  the warrant.

8  **V.    CONCLUSION**

9    79.    Based on the information above, there is probable cause to believe the locations described

10  in **Attachments A1-A2** contain evidence, fruits, and instrumentalities of violations of 18 U.S.C.

11  §§ 371/1349 (Conspiracy), 1014 (False Statement to a Bank), 1343 (Wire Fraud), 1344 (Bank Fraud),

12  1546 (Visa Fraud), 1956/1957 (Money Laundering), and 26 U.S.C. § 7201 (Tax Evasion), as described

13  in **Attachment B**.  As described in **Attachment C**, the execution of the warrants will be conducted in

14  accordance with the Northern District of California's Protocol for Searching Devices or Media that Store

15  Data Electronically.

16  **VI.    REQUEST FOR SEALING**

17    80.    The FBI is engaged in an ongoing investigation into fraudulent conduct by ▮▮▮,

18  PENG, and related parties.  I believe that prematurely revealing the existence of this criminal

19  investigation may jeopardize the ongoing investigation by giving these individuals an opportunity to

20  destroy or tamper with evidence, interfere with or intimidate potential witnesses, and to otherwise thwart

21  the efforts of law enforcement.

22

23  //

24

25  //

AFFIDAVIT OF FBI SA STEVE COFFIN                     26

1      81.     Therefore, I request that this Application and Affidavit, the Warrants, and any

2  accompanying order(s) be filed under seal until further order of the Court, except that working copies

3  should be made available to the United States Attorney's Office or the FBI.

4      I declare under penalty of perjury that the above is true and correct to the best of my knowledge

5  and belief.

6

            Steve Coffin

7             Special Agent

              Federal Bureau of Investigation

8

9  Sworn to and subscribed before me

10  this 24ᵗʰ day of September 2019.

11

12  THE HONORABLE JOSEPH C. SPERO

    CHIEF UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

AFFIDAVIT OF FBI SA STEVE COFFIN       27

**ATTACHMENT A1**

*PROPERTY TO BE SEARCHED – RESIDENCE OF* ▓▓▓▓▓▓▓▓

The residence of ▓▓▓▓▓▓▓▓ is described as a multi-level single family home located on a winding residential street with the address of ▓▓▓▓▓▓▓▓, Mill Valley, California. The driveway and garage are at street level, while the main home sits on a lower hillside so the most visible part of the house from the street is the roof. The house is further described as having a wooden exterior, with a wooden fence alongside the street, and the roof has solar panels installed on it. There appears to be an office or mother-in-law unit under the garage, which is included in the residence. On the street, there is a mailbox with the number "▓" on the front, and fire hydrant is near the driveway.

## ATTACHMENT A2

### *PROPERTY TO BE SEARCHED – BUSINESS OFFICE IN THE OAKLAND AIRPORT EXECUTIVE HOTEL, FORMERLY THE RED LION HOTEL*

The business office of the Oakland Airport Executive Hotel, formerly the Red Lion Hotel, is described as the offices of the hotel at 150 Hegenberger Road, Oakland, to include:  a) the room designated as "110", b) the room designated as the "Executive Office," and adjoining areas where there are doorways, including communicating doors between suites, allowing unimpeded access from one office to another.  The hotel is further described as a hotel with six floors, approximately 189 rooms, with meeting spaces, a restaurant, a business center, a fitness center, and a pool.  The hotel has signs by the street and over the entrance to the lobby indicating a name change to the Oakland Airport Executive Hotel.

## ATTACHMENT B

### *ITEMS TO BE SEIZED*

The following items to be seized in whatever form (including electronic) found at the Property to be Searched described in Attachment A, including any digital devices, for evidence, fruits or instrumentalities of violations of 18 U.S.C. §§ 371/1349 (Conspiracy), 1014 (False Statement to a Bank), 1343 (Wire Fraud), 1344 (Bank Fraud), 1546 (Visa Fraud), 1956/1957 (Money Laundering), and 26 U.S.C. § 7201 (Tax Evasion), for the period January 1, 2012 to the present, These records and materials are more specifically described as follows:

1. Contracts, agreements, communications, and other records relating to control, including ownership or management; purchase, sale, other disposition; financial status including revenues, losses, loans, loan payments, or distribution of proceeds or losses from the following properties, collectively the "Subject Properties":

   a. The hotel located at 64-68 6th Street, San Francisco, California, also known as the Shree Ganeshai Hotel;

   b. The hotel located at 150 Hegenberger Road, Oakland, California, also known as the Red Lion Hotel, and the Oakland Airport Executive Hotel;

   c. The hotel located at 155 Dorset Drive, Dixon, California, also known as the Comfort Inn & Suites, and the Country Inn & Suites; and

   d. The house and vineyard at 3198 Redwood Road, Napa, California.

2. Records relating in any way to the following entities:

   a. Morning Sun Capital LLC;

   b. 150 Hegenberger Capital;

   c. CP Capital Group, Inc;

3. Records of personal or business financial statements, including any underlying documents and correspondence, for the following individuals (hereinafter the "Subject Individuals"):

    a. ██████████;

    b. ██████;

    c. █████████;

    d. █████████;

    e. ███████████;

    f. ████████;

    g. █████████;

    h. ██████;

    i. ████████████;

    j. ███████████████;

    k. ██████████; or

    l. Xuehua ("Ed") PENG.

4. Records relating to business or personal relationships, including contracts, agreements, photographs and communications, between or among owners of bank accounts that were used to fund purchases of the Subject Properties and the paper owners of the Subject Properties, including but not limited to the Subject Individuals.

5. Correspondence, photos, or documents, including policy records, or diplomas, showing:

    a. Ownership of a Met Life insurance policy, or

    b. Attendance at The ██████ School.

6. Records relating to travel, visa applications, or any other entry or immigration status applications into the United States for any of the Subject Individuals.

7. Records involving communication between ▮▮▮▮▮▮▮▮ and Xuehua "Ed" PENG and any individuals in the People's Republic of China relevant to financial transactions.

8. Records relating to familial relationships involving ▮▮▮▮▮▮ or Xuehua "Ed" PENG.

9. Records involving communication by or with representatives of the People's Republic of China, the PRC Communist Party, or state and local government officials in the PRC.

10. Records used or related to tax preparation or filing, including correspondence about income, expenses, deductions, or taxes with preparers or others, W-2s, K-1s, 1099s, draft and filed personal tax returns, and draft and filed corporate tax returns.

1

**ATTACHMENT C**

2   *UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA*
    *PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY*

3

4       1.    In executing this warrant, the government will begin by ascertaining whether all or part of a
search of a device or media that stores data electronically ("the device") reasonably can be completed at
5   the location listed in the warrant ("the site") within a reasonable time.  If the search reasonably can be
completed on site, the government will remove the device from the site only if removal is necessary to
6   preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a
crime.

7       2.    If the government determines that a search reasonably cannot be completed on site within a
reasonable time period, the government must determine whether all or part of the authorized search can
8   be completed by making a mirror image of, or in some other manner duplicating, the contents of the
device and then conducting the forensic review of the mirror image or duplication off site. The
9   government will complete a forensic review of that mirror image within 120 days of the execution of the
search warrant.

10

11      3.    In a circumstance where the government determines that a mirror image of the contents
of a device cannot be created on site in a reasonable time, the government may seize and retain that
device for 60 days in order to make a mirror image of the contents of the device.

12

13      4.    When the government removes a device from the searched premises  it may also remove
any equipment or documents ("related equipment or documents") that reasonably appear to be necessary
to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

14

15      5.    When the government removes a device or related equipment or documents from the site
in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the
16   device,  the government must file a return with a magistrate judge that identifies with particularity the
removed device or related equipment or documents within 14 calendar days of the execution of the
search warrant.

17

18      6.    Within a reasonable period of time, but not to exceed 60 calendar days after completing
the forensic review of the device or image, the government must use reasonable efforts to return, delete,
19   or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law
to retain such data.

20      7.    The time periods set forth in this protocol may be extended by court order for good cause.

21      8.    In the forensic review of any device or image under this warrant the government must
make reasonable efforts to use methods and procedures that will locate and expose those categories of
22   files, documents, or other electronically-stored information that are identified with particularity in the
warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files to the
23   extent reasonably practicable.

24      9.    For the purposes of this search protocol, the phrase "to preserve evidence" is meant to
encompass reasonable measures to ensure the integrity of information responsive to the warrant and the
25   methods used to locate same.