Pages 1-21

<pre>
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
 2                        SAN FRANCISCO DIVISION

 3

 4   UNITED STATES OF AMERICA,    )  Case No.  19-mj-71565-MAG-1
                                  )
 5             Plaintiff,         )  San Francisco, California
                                  )  Courtroom F, 15th Floor
 6        vs.                     )  Wednesday, October 2, 2019
                                  )
 7   XUEHUA PENG,                 )
                                  )
 8             Defendant.         )
     _____)

 9

10

                     TRANSCRIPT OF DETENTION HEARING
11          BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY
                     UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   For Plaintiff:             COLIN C. SAMPSON, ESQ.
                                JOHN H. HEMANN, ESQ.
15                              BENJAMIN KINGSLEY, ESQ.
                                United States Attorney's Office
16                              of Northern District of California
                                450 Golden Gate Avenue, 11th Floor
17                              San Francisco, California 94102
                                (415) 436-7200
18
     For Defendant:            ELLEN LEONIDA, ESQ.
19                             Federal Public Defender's Office
                               450 Golden Gate Avenue, Room 19-6884
20                             Box 36106
                               San Francisco, California 94102
21                             (415) 436-7700

22   For U.S. Pretrial         JALEI KINDER
     Services:
23
     Mandarin Interpreter:     SHAN TSEN
24

25   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
</pre>

2

1 | APPEARANCES:  (Cont'd.)

2 | Transcription Service:          Peggy Schuerger
                                    Ad Hoc Reporting
3 |                                 2220 Otay Lakes Road, Suite 502-85
                                    Chula Vista, California 91915
4 |                                 (619) 236-9325

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>SAN FRANCISCO, CA  WEDNESDAY, OCTOBER 2, 2019  11:06 A.M.</u>

2                            --oOo--

3            THE CLERK:  Calling Criminal Action C-19-71565, USA v.

4    Xuehua Peng.  Counsel and the Mandarin interpreter, please come to

5    the podium.

6            MR. SAMPSON:  Good morning, Your Honor.  Colin Sampson,

7    Benjamin Kingsley, and John Hemann for the United States of

8    America.

9            THE COURT:  Good morning.

10           MS. LEONIDA:  Good morning, Your Honor.  Ellen Leonida

11   with Mr. Peng.  He's present in custody being assisted by a

12   Mandarin-speaking interpreter.  If I could just have a moment for

13   him to fill out the financial.

14           THE COURT:  Yes.

15        (Pause.)

16        Okay.  Well, I don't know what you want to address first --

17   the financial affidavit or the detention hearing.  I mean, they

18   may be somewhat related but, from this affidavit, he doesn't

19   qualify for appointment of counsel.

20           MS. LEONIDA:  Maybe -- my preference would be to allow

21   me to conduct the detention hearing.

22           THE COURT:  I'll certainly allow you to conduct the

23   detention hearing.  That's fine.  But then he's going to have to

24   -- I mean, I suppose depending on -- yeah, he's going to have to

25   find some counsel.  He doesn't qualify.

4

1      But I will of course allow it to go forward today.

2      All right.  So this is on for detention.  Have the parties

3  had the opportunity to review the Pretrial report?

4           MR. SAMPSON:  Yes, Your Honor.

5           THE  COURT:   All  right.   I  guess  this  is  not  a

6  presumption case, so the burden is on the Government.  Would you

7  like to go first?

8           MR. SAMPSON:  Yes, Your Honor.  Although it is not a

9  presumption case, the risk of flight in this case is, to put it

10  mildly, high.

11      Your Honor, the allegations in the complaint are extremely

12  serious.

13           THE COURT:  Oh, I should stop.  Sorry.  The matter that

14  was raised and is not disputed, the Court will accept, has in

15  mind, and doesn't need to be discussed.  How's that? -- so that we

16  can keep the hearing open.

17           MR. SAMPSON:  Thank you, Your Honor.

18           THE COURT:  Is that clear?  Okay.  All right.  So we'll

19  go forward.

20           UNIDENTIFIED COUNSEL:  Your Honor, can I just intercede

21  just on the sealing issue?

22           THE COURT:  Yes.

23           UNIDENTIFIED COUNSEL:  With the understanding that the

24  Government will assert factual matters not attributed to the

25  source that Ms. Leonida raised as being a problem.  There are

1  factual matters -- I'm trying to figure out a way to say this

2  without -- without saying what --

3         THE COURT:  It was a very specific issue that was raised

4  in the motion to seal.

5         UNIDENTIFIED COUNSEL:  Correct.

6         THE COURT:  Yes.

7         UNIDENTIFIED COUNSEL:  And there are facts that we

8  learned as a result of that very specific issue.  Those facts are

9  part of our detention argument.  We don't (indiscernible) certain

10  facts without identifying the source for the facts.  And if that

11  is acceptable to Your Honor, then -- then I think we're all --

12         THE COURT:  Okay.  You know the concern that was raised.

13  So if you think it doesn't implicate that concern.

14         UNIDENTIFIED COUNSEL:  I think it implicates the

15  concern.  I think we can probably dance around this for the

16  purpose of addressing the concern.  However, we could very easily,

17  if any of those facts are contested, we're going to go right to

18  what the source is and right to the issue that Your Honor --

19         THE COURT:  All right.  Well, then we'll address that

20  when we get there.  Thank you for raising that.

21         UNIDENTIFIED COUNSEL:  Okay, Your Honor.

22         MR. SAMPSON:  Your Honor, to continue, the allegations

23  in the complaint are extremely serious ones.  They allege that the

24  Defendant, after taking an oath of allegiance to the United

25  States, worked for China's Ministry of State Security, or the MSS,

1  and conducted numerous dead drops in the United States over

2  several years, in California and in Georgia, and paying a source

3  for SD parts that he took to his handlers in the People's Republic

4  of China.

5      Now having been caught and facing a ten-year sentence, Your

6  Honor, Defendant, Mr. Peng, has a strong incentive to flee the

7  United States and seek protection in China where, by the way, he

8  has a bank account, an apartment, and a mistress.

9      Your Honor, additionally, the Defendant -- the threat that

10 Mr. Peng will flee the United States is a real one.  He has

11 significant financial resources, both his own and a relative's

12 here in the United States.  And, Your Honor, recently, in a case

13 before Judge Donato, the Defendant went to Tijuana and took a

14 flight from Tijuana to Beijing on the eve of his trial.  That was

15 the *Chang* case.

16         THE COURT:  I don't know why that's relevant.

17         MR. SAMPSON:  Well, Your Honor, it's a real -- it's a

18 real concern, Your Honor, that the Defendant will have the

19 incentive to leave the United States, cross a border, get a

20 flight, and that the People's Republic --

21         THE COURT:  Yeah.  He had that incentive, regardless of

22 whether someone else --

23         MR. SAMPSON:  Well, I'm saying it's a real threat, Your

24 Honor.  It's a real concern.  It's not just theoretical.

25     Your Honor, additionally, the People's Republic of China and

1   the MSS certainly have an incentive to assist him in doing so,

2   such that these proceedings do not continue and the facts that

3   have been developed to date do not go further.

4   Your Honor, we don't know what the MSS has told its

5   operatives about what to do if they get caught, but they certainly

6   may have been instructed to try to flee the United States.

7   We also know, Your Honor, from the video that was attached to

8   the complaint that the Defendant has engaged in serious and

9   repeated covert activities, including taking envelopes of cash to

10  hotel rooms that he's rented, picking up SD cards and flying to

11  China.  It is certainly possible that Mr. Peng has been instructed

12  in countersurveillance as well.

13  So, Your Honor, for several years the Defendant has been

14  continuously working for a foreign spy agency and, again, the

15  facts as alleged in the complaint are serious.

16  He also, Your Honor, has questionable financial connections.

17  Given his stated income and his very large expenses and, as Your

18  Honor pointed out, significant assets, those are the subject of

19  the Government's investigation as well.

20  So, Your Honor, there's no amount that the Defendant or his

21  relatives can post that will really overcome the serious risk of

22  flight.  And the government of China, PRC and the MSS, certainly

23  may be able to make him whole should he forfeit any bail amounts

24  and flee to China.

25          THE COURT:  So tell me why he would leave his wife and

1    kids.  I understand the money, but tell me that.

2              MR. SAMPSON:  He's facing a ten-year sentence.  He has

3    assisted a foreign government in conducting espionage activities

4    in the United States.  And they go back to a time when he was

5    seeking naturalization here, so there are concerns there.

6        And, Your Honor, he has a bank account.  He has an apartment.

7    He has contacts.  And at least until recently, he has had a

8    significant other in the PRC.  And, Your Honor, his spouse and his

9    children may also seek to depart the United States as well.

10             THE COURT:  So what is the -- I mean, I'll just be

11   candid with you.  One other thing.  I understand the money

12   argument, but the family -- 'cause the wife's a citizen.  The kids

13   are native-born citizens of the United States; correct?

14             MR. SAMPSON:  I'm not sure that the bail study said that

15   she was a naturalized United States citizen.

16             THE COURT:  Oh.

17       (Pause.)

18       Well, you're right.  No, she -- right, right.  She's a legal

19   resident of the United States.  Okay.  And what is the basis for

20   the Government's proffer that he had other contacts or -- I'm

21   trying to say it a polite way -- a mistress in China?

22             MS. LEONIDA:  We don't contest that, Your Honor.

23             THE COURT:  What?

24             MS. LEONIDA:  We don't contest that.

25             THE COURT:  You don't contest it.  Okay.  I appreciate

1    that.  Okay.  All right.  So there is a significant flight risk.

2              MS. LEONIDA:  Your Honor, it's -- to the extent that

3    there is, it's one that can be mitigated by imposing conditions to

4    address it.  As the Court is aware, the weight of the evidence is

5    the least significant factor in determining whether the Defendant

6    should be detained.  And while the nature of these charges is

7    serious, the charges establish a courier.

8        He acted as a courier, according to the information in the

9    complaint, on several occasions over a number of years.  But I

10   believe that the Government's own conduct demonstrates that he's

11   not a danger and he's not a flight risk because --

12             THE COURT:  They're not arguing he's a danger.  The

13   complaint ends I think in June 2018 as well.

14             MS. LEONIDA:  Exactly, and that's what I was about to

15   address.  The complaint ends in June 2018.  And despite the videos

16   and the fanfare and the press conferences, the Government did

17   nothing for a year.  And during that year, Mr. Peng has lived in

18   the United States with his legal resident wife, with his two

19   American citizen children.  They went to school.  He worked at a

20   job that he's had for ten years, though with different companies.

21       He lived in a house that he owns.  His wife is in the United

22   States.  His two young daughters are in the United States.  His

23   adult daughter is here.  His sister is here.  Her husband is here.

24   He doesn't have any criminal record other than a driving

25   infraction, I believe.  He has no history of not coming to court.

1  He's not at risk because he has no drug or alcohol abuse history.

2      I think that conditions can be crafted to ensure his

3  appearance.  He has every motivation to stay here and he is

4  willing to post a property bond.  His sister is also willing to

5  put up her house.

6          THE COURT:  How much -- the Pretrial report didn't say

7  how much equity is in her home.

8          MS. LEONIDA:  In her home, I thought it did.  I'm sorry.

9  It didn't, but she's here and I can ask her.

10         MR. SAMPSON:  Your Honor, these proposed sureties are

11 extremely problematic.  The source of funds -- the vast, vast

12 majority of the source of funds for Mr. Peng, his sister, and his

13 daughter are traceable to wires out of the PRC, numerous, dozens

14 and dozens of $50,000 wires coming out of the PRC and into bank

15 accounts controlled by the Defendant's sister, also the

16 Defendant's daughter, and himself.

17         THE COURT:  Okay.

18         MR. SAMPSON:  Your Honor, indeed, paragraph 27 of the

19 complaint indicates that the MSS handlers said that they

20 controlled Mr. Peng's business.  And so, Your Honor --

21         THE COURT:  That was the -- but I understood that to be

22 the -- the U.S. Tours business; right?

23         MR. SAMPSON:  It's not clear, Your Honor.  But what is

24 -- what is clear is that there seems to be a discrepancy about the

25 source of Mr. Peng's income.  He indicated that he had been

1    employed for ten to 15 years in the travel -- with U.S. Tour and

2    Travel.  His sister I believe said that it was two or three years.

3                 THE COURT:  I think it's the other way around.

4                 MR. SAMPSON:  Okay.

5                 THE COURT:  It was two to three years -- he indicated

6    ten years or so with his sister's company, and his sister said it

7    was two to three years.  Her company's not U.S. Travel.  Isn't

8    that the one that was --

9                 MR. SAMPSON:  Her company is C.P. --

10                THE COURT:  Right.

11                MR. SAMPSON:  -- Company.

12                MS. LEONIDA:  And, Your Honor, I can explain that.  I've

13   spoken to his sister.  The -- there are two different companies

14   that do the same things, so Mr. Peng has been involved in the same

15   line of work with his sister for ten years, but through different

16   companies.

17                THE COURT:  So -- but I'm -- so the proffer is that

18   there are wires from China that went directly to bank accounts

19   controlled by his daughter and his sister.

20                MR. SAMPSON:  And -- and himself.  Many millions of

21   dollars from 2013 on.

22                THE COURT:  No.  I get by himself, but also his daughter

23   and his sister.

24                MR. SAMPSON:  Yes, Your Honor.  And so there's a

25   financial intertwinement that is extremely serious and concerning

1   and is the subject of the Government's investigation.  And, Your

2   Honor, I do -- I do have a couple more points.  I have exhibits.

3        Your Honor, the Defendant, although he declined to provide

4   information  about  his  travel,  his  international  travel  to

5   Pretrial, Your Honor, since 2015 alone, since the conduct in the

6   complaint alone, the Defendant has made 15 trips to the PRC.  And

7   that's based on CBP records, Your Honor, which I can mark as an

8   exhibit.

9             THE COURT:  Fifteen, so about four a year?

10            MR. SAMPSON:  Approximately, Your Honor.  And that's --

11  that does not include more than a dozen trips before that since

12  he's been inside the United States.

13            MS. LEONIDA:  Your Honor, the Government now has his

14  passport.  He can no longer fly out of the United States.  He

15  could be put on GPS monitoring.  He can be restricted to his home.

16  There are conditions that can mitigate any risk.

17            THE COURT:  Well, it can mitigate it.  The question is

18  whether it can mitigate it to a flight risk.  I'm not -- I --

19  well, in light of the fact that he has an apartment, money, and

20  had a mistress, I'm not satisfied that the presence of his wife

21  and his children here would be a sufficient incentive for him to

22  stay, given that he -- given that apparently undisputed fact, and

23  that I'm not satisfied either that his -- his daughter and his

24  sister putting up their homes as well, given that now the proffer

25  is, at least, that money was going to them and that somehow they

1  were, whether wittingly or unwittingly, being used.

2          MS. LEONIDA:  I'm at a disadvantage not having received

3  the --

4          THE COURT:  I understand.  No, no, no.  I understand,

5  but that's the proffer.

6          MS. LEONIDA:  What I don't -- what I don't hear in the

7  proffer is that the money being wired, its interest in illegality.

8          THE COURT:  Well, what would be the legal basis for it?

9          UNIDENTIFIED COUNSEL:  Your Honor, the Government is

10  prepared to make a much more detailed proffer about his sister's

11  finances, if the Court wishes.  She's the subject of a fraud

12  investigation that relates to the money that she's received from

13  overseas which she alludes to purchased properties in this

14  district totaling millions of dollars.

15      She then used those properties to secure further loans on

16  which she lied about the actual source and her control of the

17  funds.  These are the subject of separate investigations and the

18  Government has been actively investigating that.  I think Mr. Peng

19  probably is aware of some of the things we've done, which are --

20  we can go into more detail if the Court wants, and we've got a lot

21  of specifics on that as well.

22          THE COURT:  I don't know.  There's a lot I understand

23  that you're learning at the moment, so I don't know -- I'm not

24  prepared to release him in light of that proffer and all that's

25  out there, that what's been proposed is just not sufficient, but

1   I understand that you haven't had a chance, or his new counsel

2   will not have had a chance -- but can I ask you about his $500,000

3   which is sitting in a bank account.  You say the Defendant is in

4   contract to purchase another home?

5           MS. LEONIDA:  Yes.  He and his wife are moving to a

6   different -- to a different city because of -- a different school

7   district for their children, so they have a home that they want to

8   buy and he got a home equity loan from the home that he lives in

9   that's in the bank account as well as a $100,000 loan from his

10  sister's company.  That's going toward a new home that they plan

11  to buy.

12          THE COURT:  Well, they plan to buy or they are in

13  contract to buy?

14          MS. LEONIDA:  They're in contract.

15          THE COURT:  And what city is that in?

16          MS. LEONIDA:  Castor Valley, Your Honor.

17          THE COURT:  I'm just wondering why the wife's

18  explanation seemed a little bit different, but, in any event --

19          MS. LEONIDA:  When Pretrial Services interviewed the

20  wife, there wasn't a certified interpreter.

21          THE COURT:  I understand.

22          MS. LEONIDA:  And there's a couple of things -- like,

23  for example, he didn't live in the county for two years.  That was

24  an error in translation.  And I met with the family and the

25  certified interpreter today corrected that.

1          THE COURT:  Okay.  All right.  Well, so I understand

2   that.  It's all to say that's the reason why he doesn't qualify

3   for appointment of counsel, given the equity that he has in his

4   current home and the cash that's available.

5       But, as I said, I'm not prepared to release him today based

6   on what the Government has proffered.

7       So I can do a final order.  We can -- you know, there's going

8   to have to be another lawyer come in.   I mean, well --

9          MS. LEONIDA:  I would ask that --

10         THE COURT:  Obviously, if new circumstances develop in

11  terms of when you get that discovery, then it can always be

12  reopened at that point.

13         MS. LEONIDA:  I would ask the Court not to issue a final

14  order.

15         THE COURT:  That's fine.

16         MS. LEONIDA:  Because I'm not appointed, I do think

17  that, you know, because the Government is proffering this

18  today, --

19         THE COURT:  Yes.

20         MS. LEONIDA:   -- that new counsel will want to

21  investigate that.

22         THE COURT:  What we could do is we could waive it for

23  today without prejudice, and even the expectation perhaps that it

24  will be reopened when new counsel comes in, gets discovery, and

25  has a chance to do more investigation.

1      But I'll tell you -- I'll just -- to make it clear, he has --

2  he has substantial ties to China, including the Chinese government

3  with respect to the allegations of the complaint, which are

4  supported by probable cause, and that he has also personal ties,

5  as we've discussed, to China and his ties here I find do not

6  outweigh that, given the ties that he has in China.

7      And then the Government has proffered that there's financial

8  entanglements with his daughter and sister that I can't say today

9  would make them appropriate sureties that I would be satisfied

10 that them posting their homes would be sufficient to mitigate the

11 risk of flight.

12     So that's what I'm saying today.  If you need to consult with

13 Mr. Peng about waiting -- the reason why I'm going to not appoint

14 Mr. Peng counsel and you're going to have to find your own counsel

15 is because he does have at least $500,000 sitting in the bank.

16     I understand he's in contract to buy a home.  He can't buy

17 it.  That's just it.  The Federal Government doesn't pay for

18 counsel for people who have that -- those means.

19     It's actually not even a close question in this particular

20 case.

21          MR. PENG:  (Indiscernible.)

22          THE COURT:  I understand that, that it is costly to pay

23 for an attorney.  I understand that.  It is not without cost or

24 sacrifice.  But you simply don't -- you don't qualify for that.

25          But Ms. Leonida represented you today.  I'll have her

1  continue to represent you until you get new counsel, but your

2  family should immediately start seeking representation, which she

3  could be of assistance to you to find counsel.

4      All right.  So are we waiving at this point then?

5          MS. LEONIDA:  Yes, Your Honor.

6          THE COURT:  Okay.  So, Mr. Peng, I'm going to order you

7  to remain remanded to the custody of the U.S. Marshals.  That is

8  without prejudice.  When you get your new lawyer, your lawyer can

9  come back and we can have a new hearing.  You'll have an

10 opportunity -- your lawyer will have an opportunity to review some

11 of the proffer, the evidence that the Government has proffered

12 today.  And a chance maybe to dispute it or show that it's

13 incorrect.

14     But based on the proffer that is made today, I think the

15 Government has met its burden of proving by a preponderance of the

16 evidence a risk of flight.

17         MS. LEONIDA:  Can I also ask the Court to order that the

18 Government provide some discovery of the financial --

19         THE COURT:  Yes.  Well, you could --

20         UNIDENTIFIED COUNSEL:  We can -- there are documents

21 that we can make public.

22         THE COURT:  Yeah.

23         UNIDENTIFIED COUNSEL:  Yeah, so, Your Honor, there are

24 -- the Government moves to unseal four search warrant affidavits

25 and applications relating to the Defendant's sister for searches

1  that were executed last week and were signed by Judge

2  (indiscernible).  I can get you a written order, but we will do

3  that --

4          THE COURT:  Yeah.

5          UNIDENTIFIED COUNSEL:  -- today.  I think we need to

6  make sure that they're redacted for any PII.

7          THE COURT:  All right.  Why don't you send it to my

8  chambers and I'll sign those orders.

9          UNIDENTIFIED COUNSEL:  We'll do that.

10          THE COURT:  Yeah.  I mean, you stated it in open court,

11  so the investigation --

12          UNIDENTIFIED COUNSEL:  The investigation is not a

13  secret, yeah, and we're prepared to unseal that anyway at this

14  time.

15          THE COURT:  All right.  Yeah.  And go ahead and provide

16  it to Ms. Leonida because she's counsel for the moment and then

17  she can facilitate the transfer to a new attorney when a new

18  attorney comes in.

19          UNIDENTIFIED COUNSEL:  We will do so.  Your Honor, one

20  issue just on the waiver --

21          THE COURT:  Yeah.

22          UNIDENTIFIED COUNSEL:  The Court has spent a bunch of

23  time reviewing this.  Would the Court anticipate if Ms. Leonida is

24  supposed to come back, it's going back --

25          THE COURT:  Oh, to me, yes.

1            UNIDENTIFIED COUNSEL:  Okay.

2            THE COURT:  Yes.  No.

3            UNIDENTIFIED COUNSEL:  I know it's the beginning of the

4    month anyway, but --

5            THE COURT:  No, no, no.  It sticks with -- even though

6    it was a waiver, it's an offense.  It should stick with me.

7            UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

8            THE COURT:  Okay.  All right.  Do we have a preliminary

9    hearing date?

10           MS. LEONIDA:  I don't believe we do.

11           MR. SAMPSON:  We do not, Your Honor.

12           THE COURT:  Okay.  So we need one 14 days from the first

13   appearance.

14           MR. SAMPSON:  Well, Your Honor, there was previously a

15   Speedy Trial Rule 5.1 stipulation.

16           MS. LEONIDA:   I think 14 days would be a week from

17   Friday.

18           THE COURT:  So the 11th.

19           MS. LEONIDA:  Yeah.

20           MR. SAMPSON:  Well, Your Honor, actually there was a

21   previous Speedy Trial stipulation under Rule 5.1 which should

22   continue that by at least five days.

23           THE COURT:  When was his first -- I thought this was his

24   second -- this is his second appearance.

25           MR. SAMPSON:  This is his second appearance.

1          MS. LEONIDA:  His first appearance was September 27th.

2          THE COURT:  You're saying on September 27th, there was

3   a waiver of the Rule 5 --

4          UNIDENTIFIED COUNSEL:  Waiver on the Rule 5.1 from

5   Friday to today.

6          THE COURT:  Oh, from Friday to today.  Okay.  All right.

7   So to the 15th then.  Okay.  October 15th will be the preliminary

8   hearing or arraignment date for Mr. Peng.  Should your new

9   attorney want to come back for a detention hearing before that, he

10  can put it on as soon as he wants -- or she wants.

11      (Counsel and Defendant confer.)

12          MR. PENG:  (Indiscernible).

13          THE COURT:  I understand, Mr. Peng.  I understand and I

14  have taken that into account and I accept that and I understand

15  that and I understand and accept that you have a lot of support

16  here in the courtroom.  I can see that.  And I see that.

17          MR. PENG:  I understand, but --

18          THE COURT:  All right.  But you are going to have to

19  find another attorney, Mr. Peng, not -- not -- Ms. Leonida is

20  outstanding but, unfortunately, she's here to represent those who

21  cannot afford their own counsel.

22      All right.  Thank you.

23          MR. SAMPSON:  Thank you, Your Honor.

24          ALL:  [Thank you, Your Honor.]

25  //

1          (Proceedings adjourned at 11:32 a.m.)

2

3          I, Peggy Schuerger, certify that the foregoing is a correct

4     transcript from the official electronic sound recording provided

5     to me of the proceedings in the above-entitled matter.

6

7     _____                    October 20, 2019
      Signature of Approved Transcriber            Date

8

9     Peggy Schuerger
      Typed or Printed Name
10    **Ad Hoc Reporting**
      Approved Transcription Provider
11    for the U.S. District Court,
      Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25